UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

FILED by _____ D.C.

JAN 0 3 2017

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

[UNDER SEAL]                    §
                               §
            Plaintiffs,        §
                               §    Civil Action No. _____
v.                             §
                               §    **COMPLAINT FOR DAMAGES
[UNDER SEAL]                    §    UNDER THE FEDERAL FALSE
                               §    CLAIMS ACT AND VARIOUS STATE
            Defendants.        §    FALSE CLAIMS ACTS AND
                               §    DEMAND FOR JURY TRIAL**
                               §
                               §    <u>FILED UNDER SEAL</u>
                               §    (PURSUANT TO 31 U.S.C. § 3730(b))
                               §
                               §    **DO NOT ENTER INTO PACER**
                               §
                               §    **DO NOT PLACE IN PRESS BOX**

Civil Action No. 17-20012 cv-Williams

MAGISTRATE JUDGE SIMONTON

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Chionesu Sonyika, Relator, | § § § | |
| STATE OF FLORIDA, *ex rel.* Chionesu Sonyika, Relator, | § § § | |
| STATE OF GEORGIA, *ex rel.* Chionesu Sonyika, Relator, | § § § | |
| STATE OF INDIANA, *ex rel.* Chionesu Sonyika, Relator, | § § § | |
| STATE OF IOWA, *ex rel.* Chionesu Sonyika, Relator, | § § § | Civil Action No. _____ |
| STATE OF TENNESSEE, *ex rel.* Chionesu Sonyika, Relator, | § § § | **COMPLAINT FOR DAMAGES UNDER THE FEDERAL FALSE CLAIMS ACT AND VARIOUS STATE FALSE CLAIMS ACTS AND DEMAND FOR JURY TRIAL** |
| STATE OF TEXAS, *ex rel.* Chionesu Sonyika, Relator, | § § § | |
| Plaintiffs, | § § | **TO BE FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)** |
| v. | § § | |
| ApolloMD, Inc., Independent Physicians Resource, Inc., ApolloMD Business Services, LLC, Apollo MD Holdings, LLC, PaymentsMD, LLC, ApolloMD Group Services, LLC, ApolloMD Physician Partners, Inc., ApolloMD Physician Services FL, LLC, and Georgia Emergency Group, LLC | § § § § § § § § § § | **DO NOT ENTER INTO PACER** **DO NOT PLACE IN PRESS BOX** |
| Defendants. | § § | |

### PLAINTIFFS' ORIGINAL COMPLAINT

Relator CHIONESU SONYIKA, M.D., ("Relator" or "Dr. Sonyika") in the above-styled action brings this suit on behalf of the United States of America (the "United States") and the States of Florida, Georgia, Indiana, Iowa, Tennessee and Texas (collectively the "Plaintiff States") against Defendants ApolloMD, Inc., Independent Physicians Resource, Inc., ApolloMD Business Services, LLC, ApolloMD Holdings, LLC, PaymentsMD, LLC, ApolloMD Group Services, LLC, ApolloMD Physician Partners, Inc., ApolloMD Physician Services FL, LLC, and Georgia Emergency Group, LLC (collectively "Defendants" or "Apollo").

## I.     INTRODUCTION

1.      Apollo is a privately-held, national group practice that provides staffing and management services to hospitals related to emergency medicine, hospital medicine, anesthesia and radiology.  Headquartered in Atlanta, Georgia, Apollo has a presence at hospitals and healthcare centers in at least sixteen (16) states.  Apollo's revenue in 2014 totaled over $400 million.  This case is about Apollo's use of a fraudulent scheme (the "Scheme") to systematically submit false claims to the Centers for Medicare and Medicaid Services ("CMS") and Plaintiff State's Medicaid programs for reimbursement for services performed by mid-level healthcare providers at Apollo emergency rooms.  Apollo knowingly and intentionally carries out its unlawful Scheme to obtain grossly overpaid reimbursement amounts from CMS and Plaintiff State's Medicaid program.

2.      Relators bring this action pursuant to the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. § 3729 *et. seq.* ("FCA"), and the similar *qui tam* provisions of the Florida False Claims Act, Fl. Stat. §§ 68.081 *et. seq.*; Georgia False Medicaid Claims Act, Ga. Code Ann. §§ 49-4-168 *et. seq.*; Indiana Medicaid False Claims and Whistleblower Protection Act,

Ind. Code §§ 5-11-5.7-1 *et. seq.*; Iowa False Claims Act, IOWA CODE §§685.1 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code §§ 71-5-181 *et. seq.*; and the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§ 36.002 *et. seq.*

3.    Under the Scheme, Apollo uniformly and systematically overbills CMS and the Plaintiff States for services performed solely by physician assistants ("PAs") and nurse practitioners ("NPs") — collectively "mid-levels" — by submitting claims for these mid-level services under a physician's National Provider Identification number ("NPI") as if a physician, rather than a mid-level, had performed the services.  When a mid-level performs services alone, without any physician involvement, CMS only reimburses for those services at 85% of the physician rate.   *See* 42 U.S.C. § 1395l(a)(1)(O).   The overwhelming majority of services provided by mid-levels in Apollo emergency departments are carried out with *no physician involvement.*   Accordingly, under CMS regulations, these services should be billed under the mid-level's NPI and reimbursed at 85% of the physician's rate.  Yet, Apollo submits every claim for mid-level services under a physician's NPI, which triggers the physician's reimbursement rate.  In other words, Apollo is systematically and unlawfully requesting reimbursement for mid-level services at 100% of the physician rate, rather than the proper 85% rate, thereby reaping a 15 percentage-point premium for every mid-level service performed in its emergency departments.

4.    Similarly, the Plaintiff States' respective Medicaid programs reimburse for mid-level services at lower rates than for physician services.  However, because Apollo submits claims for mid-level services under physicians' NPIs, Apollo unlawfully requests reimbursement from the Plaintiff States for mid-level services at 100% of the physician rate, rather than the appropriate mid-level percentage paid by each Plaintiffs State's respective Medicaid programs.

4

5.      Apollo's own executives have admitted the uniformity of Apollo's billing practices for mid-level services.  On December 2, 2016, Apollo's Chief Operating Officer, Amy Katnik, sent to all Apollo emergency physicians an email written by Apollo's Chief Quality Officer, Michael Liscomb, explicitly stating that Apollo bills for *all mid-level charts signed by a physician under the physician's NPI.*  This fact, which Apollo itself has confirmed, establishes the existence and the breadth of Apollo's unlawful Scheme.

6.      Apollo attempts to cover up its Scheme by manipulating charts to falsely reflect what is called a "shared visit."  A shared visit occurs when a mid-level treats a patient alongside a supervising physician, meaning that both the physician and the mid-level actually provide face-to-face services to the patient.  When a true shared visit occurs, CMS reimburses for the mid-level services at the same rate as the physician's services, as if the mid-level were an extension of the physician.  In the emergency department, a properly documented shared visit is the only circumstance under which mid-level services may be reimbursed at the full physician rate.

7.      However, true shared visits are exceedingly rare in Apollo's emergency departments.  Physicians and mid-levels rarely, if ever, see patients together.  Instead, to maximize efficiency and avoid overlap under Apollo's business model, mid-levels independently treat lower-acuity patients and physicians independently treat higher-acuity patients.

8.      Notwithstanding this reality, Apollo requires physicians and mid-levels to indicate in *every* mid-level medical chart that the physician provided the services to the patient by demanding that physicians sign *every* mid-level chart and indicate that the physician actually provided face-to-face services to the patient seen by the mid-level so that Apollo can bill for the mid-level services under the physician's NPI at the full physician rate.  This is required even when, as is overwhelmingly the case, no shared visit occurred.

9.      Apollo carries out its Scheme in part by paying its physicians kickbacks to sign mid-level charts—a violation of the federal Anti-Kickback Statue.  Apollo credits and pays physicians for each patient they actually see *and* for each mid-level chart they sign.  Apollo uses this kickback to induce physicians to sign charts, allowing Apollo to then improperly submit mid-level charts at the full physician rate, thereby swindling the federal government and taxpayers out of significant sums of money.

10.     Apollo's Scheme violates CMS billing regulations and guidelines and causes the knowing and/or intentional submission of illegal and false claims for reimbursement under federal and state laws.  It involves illegal physician kickbacks in violation of federal law.  It defrauds federal and state health care programs on a nationwide basis.  And, it costs taxpayers significant sums of money each year.  In this action, Relator seeks recovery of damages and civil penalties under the federal False Claims Act and similar state laws, and the Anti-Kickback Statute on behalf of the United States of America and the Plaintiff States arising from Apollo's perpetration of the Scheme.

## II.      PARTIES

### A.      RELATOR Chionesu Sonyika, M.D.

11.     Relator CHIONESU KWESI SONYIKA, M.D., is a citizen of the United States of America who currently resides in the State of Georgia.  Dr. Sonyika is currently licensed to practice medicine in Georgia and North Carolina.  He is certified by the American Board of Emergency Medicine (ABEM) and was residency-trained specifically in emergency medicine.  He brings this *qui tam* action based upon direct and unique information obtained during his employment in the emergency department at the Atlanta Medical Center-South in Atlanta, Georgia and Spalding Regional Medical Center in Griffin, Georgia, where he has worked since

2010 as an independent contractor physician for Apollo.  Through his work at these Apollo-managed emergency departments Dr. Sonyika has acquired direct personal knowledge of and non-public information about Apollo's fraudulent billing for reimbursement from federal and state healthcare payers.

**B.   DEFENDANTS**

12.    Defendants are a system of affiliated entities controlled by the same individuals and entities, operating out of the same principal office, and collectively referred to herein as "Apollo."  Apollo is a privately-held, physician-led national group practice that provides staffing and management services to hospitals in the United States, specifically in the areas of emergency medicine, hospital medicine, radiology, and anesthesiology.  Apollo is headquartered in Atlanta, Georgia, and has a presence at hospitals and healthcare centers in at least sixteen (16) states.  It partners with several major health systems and over 140 individual hospitals and surgery centers nationwide.  Apollo employs over 2,000 clinical workers, primarily as independent contractors.

13.    Defendant APOLLOMD BUSINESS SERVICES, LLC, is a Georgia limited liability company that maintains its principal place of business and principal office at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328.

14.    Defendant, INDEPENDENT PHYSICIANS RESOURCE, INC., is a subsidiary of ApolloMD Business Services, LLC, that is incorporated in Georgia and maintains its principal place of business and principal office at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328, and also is registered to do business in, *inter alia*, the State of Florida.

15.    Defendant, APOLLOMD, INC., is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is incorporated in Georgia and

maintains its principal place of business and principal office at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328.

16.      Defendant, APOLLOMD HOLDINGS, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Georgia and maintains its principal place of business at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328.

17.      Defendant, PAYMENTSMD, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Georgia and maintains its principal place of business and principal office at 5665 New Northside Dr., Suite 320, Atlanta, Georgia, 30328.

18.      Defendant, APOLLOMD GROUP SERVICES, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Georgia and maintains its principal place of business and principal office at 5665 New Northside Dr., Suite 320, Atlanta, Georgia, 30328.

19.      Defendant, APOLLOMD PHYSICIAN PARTNERS, INC., is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is incorporated in Georgia and maintains its principal place of business and principal office at 5665 New Northside Dr., Suite 320, Atlanta, Georgia, 30328.

20.      Defendant APOLLOMD PHYSICIAN SERVICES FL, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Florida and maintains its principal place of business and principal office at 5665 New Northside Dr., Suite 320, Atlanta, Georgia, 30328.

21.     Defendant, GEORGIA EMERGENCY GROUP, LLC, is a subsidiary of both ApolloMD Business Services, LLC, and Independent Physicians Resource, Inc., that is organized under the laws of Georgia and maintains its principal place of business and principal office at 5665 New Northside Drive, Suite 320, Atlanta, Georgia, 30328.

### III.     VENUE, CONDITIONS PRECEDENT, AND JURISDICTIONAL ALLEGATIONS

22.     This Court has jurisdiction over this action under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1331 and 1345 because this civil action arises under the laws of the United States.

23.     Relator brings this action under the FCA, 31 U.S.C. § 3729 *et. seq.*, to recover treble damages, civil penalties, and costs of suit, including reasonable attorneys' fees and expenses.  Relator has authority to bring this action and these claims on behalf of the United States pursuant to 31 U.S.C. §§ 3730(b) and 3730(e)(4), and Relator has satisfied all conditions precedent to participate as Relator.   Pursuant to 31 U.S.C. § 3730(e)(4)(A), the allegations contained herein have not been publicly disclosed as defined by the FCA, or alternatively, Relator qualifies as an "original source" within the meaning of 31 U.S.C. § 3730(e)(4)(A) and (B).  Pursuant to 31 U.S.C. 3730(e)(4)(B), Relator has voluntarily provided in writing to the Attorney General of the United States and the United States Attorney's Office for the Southern District of Florida, prior to filing this complaint, substantially all material evidence and information in Realtor's possession upon which these allegations are based.  In accordance with 31 U.S.C. § 3730(b)(2), Relator served the United States pursuant to Federal Rule of Civil Procedure 4 prior to filing this complaint.

24.     This Court has jurisdiction over Relator's state law claims pursuant to 31 U.S.C. § 3732, as those claims arise from the same transaction or occurrence as Relator's claim under § 3729.  Additionally, this Court has supplemental jurisdiction over Relator's state law claims

pursuant to 28 U.S.C. §1367(a), as those claims form part of the same case or controversy under Article III of the United States Constitution as Relator's claim under the federal FCA. Relator has complied with all state law procedural requirements, including service upon the appropriate state Attorneys General prior to filing this action.

25.     This Court may exercise personal jurisdiction over Apollo because Apollo transacts, operates, conducts, engages in, and carries out substantial business within the State of Florida, in accordance with the Florida Long-Arm Statute, Fla. Stat. § 48.193(1)-(2). Moreover, Apollo purposefully directs its services at the State of Florida, thereby purposefully availing itself of the privilege of conducting business within the State of Florida and invoking the benefits and protections of its laws. This action arises out of that conduct. This Court's exercise of jurisdiction over the Defendant does not offend traditional notions of fair play and substantial justice.

26.     Venue is proper in the Southern District of Florida pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b)–(c). Apollo can be found in, resides in, transacts, and/or has during the relevant time period transacted substantial business in this judicial District. Additionally, one or more of the Defendants committed acts proscribed by 31 U.S.C. § 3729 in this judicial District by perpetrating the Scheme described herein within the Southern District of Florida. Specifically, during the relevant time period, Apollo has transacted business with and/or on behalf of at least the following healthcare providers and hospitals located within the Southern District of Florida: (1) the Coral Gables Hospital in Coral Gables, Miami-Dade County, Florida; (2) the Palmetto General Hospital in Hialeah, Miami-Dade County, Florida; (3) the Hialeah Hospital in Hialeah, Miami-Dade County, Florida; (4) the Indian River Medical Center in Vero Beach, Indian River County, Florida; (4) the St. Mary's Medical Center in West Palm Beach,

Palm Beach County, Florida; (5) the Good Samaritan Medical Center in West Palm Beach, Palm

Beach County, Florida; (6) the West Boca Medical Center in West Boca, Palm Beach County,

Florida.

## IV.    MEDICARE AND MEDICAID PROGRAMS

### *The Medicare Program and Federal Administration*

27.    Medicare[1] is a federally funded program administered by CMS[2] that provides

"nearly every American 65 years of age and older a broad program of health insurance designed

to assist the nation's elderly to meet hospital, medical, and other health costs."[3]   Medicare is

funded in part by taxpayer revenue.   In 2014, Medicare spending totaled $618.7 billion and

accounted for 20% of the total healthcare spending in the United States.[4]   Unfortunately, "[f]raud

and systematic overcharging are estimated at roughly $60 billion, or 10 percent, of Medicare's

costs every year."[5]

28.    Medicare is comprised of three primary insurance programs   Medicare Parts A,

B and D—that cover different types of healthcare needs.[6]   Medicare Part A (Hospital Insurance)

covers institutional care such as inpatient hospital care, nursing services, drugs and biologicals

---

[1] Medicare is the popular name for the Health Insurance for the Aged and Disabled Act, which is title XVIII of the Social Security Act.
[2] CMS is part of the Department of Health and Human Services ("DHHS").
[3] CMS, MEDICARE GENERAL INFORMATION, ELIGIBILITY, AND ENTITLEMENT MANUAL, pub. 100-01, Ch. 1 § 10 (2015), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/ge101c0?.pdf (hereinafter "MEDICARE GENERAL INFORMATION MANUAL.").
[4]    NHE   FACT   SHEET,   https://www.cms.gov/research-statistics-data-and-systems/statistics-trends-and-reports/nationalhealthexpenddata/nhe-fact-sheet.html (last visited Mar. 10, 2016).
[5] Reed Abelson & Eric Lichtblau, *Pervasive Medicare Fraud Proves Hard to Stop*, N.Y. TIMES, Aug. 15, 2014, http://www.nytimes.com/2014/08/16/business/uncovering-health-care-fraud-proves-elusive.html.
[6] Medicare also includes Medicare Part C (also called Medicare Advantage), which is not a separate benefit, but a program whereby private companies approved by Medicare provide coverage under Medicare Part A and Part B. *See* HOW DO MEDICARE ADVANTAGE PLANS WORK?," https://www.medicare.gov/sign-up-change-plans/medicare-health-plans/medicare-advantage-plans/how-medicare-advantage-plans-work.html (last visited Dec. 12, 2016).

necessary during an inpatient stay, and other diagnostic or therapeutic services.[7]  Medicare Part B (Supplementary Medical Insurance) covers non-institutional care such as physician services, medical equipment and supplies, and services performed by qualified mid-levels under the supervision of a physician.[8]  Medicare Part D (Drug Coverage) covers the cost of prescription drugs.[9]

29.     Under Medicare's programs, the federal government reimburses healthcare providers for their labor and medical decision-making on a fee-for-service basis according to predetermined fee schedules, including the Medicare Physician Fee Schedule ("MPFS"), which establishes annual rates for more than 10,000 services provided by physicians and other healthcare professionals.[10]  The rates established in the MPFS correspond to specific five-digit codes associated with each medical procedure or service provided.  The American Medical Association publishes these Current Procedural Terminology ("CPT") codes annually.

30.     The process by which healthcare services are submitted and reimbursed involves several steps and various entities.  First, physicians and mid-levels must clearly and sufficiently document patient encounters in their medical charts.  To ensure that documentation is clear and complete, CMS has developed specific documentation guidelines that it requires healthcare providers to use—the 1995 Documentation Guidelines for Evaluation and Management Services

---

[7]  CMS, MEDICARE BENEFIT POLICY MANUAL, pub. 100-02, Ch. 1, Table of Contents (2014), https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c01.pdf (hereinafter "MEDICARE BENEFIT POLICY MANUAL").

[8]  MEDICARE GENERAL INFORMATION MANUAL at Ch. 1 § 10.3.  Medicare Part B also covers emergency department services.  *See*  MEDICARE.GOV, EMERGENCY DEPARTMENT SERVICES, https://www.medicare.gov/coverage/emergency-dept-services.html (last visited Mar. 10, 2016).

[9]  MEDICARE.GOV, DRUG COVERAGE (PART D), https://www.medicare.gov/part-d/ (last visited Mar. 29, 2016).

[10]  *See* CMS, HOW TO USE THE SEARCHABLE MEDICARE PHYSICIAN FEE SCHEDULE (MPFS) at 1 (Apr. 2014), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/How_to_MPFS_Booklet_ICN901344.pdf.   CMS also has fee schedules for ambulance services, clinical laboratory services, and durable medical equipment, prosthetics, orthotics and supplies.  FEE SCHEDULES GENERAL INFORMATION, https://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/FeeScheduleGenInfo/index.html?redirect=/feeschedulegeninfo (last visited Dec. 12, 2016).

and 1997 Document Guidelines for Evaluation and Management Services.[11]  Through the Evaluation and Management ("E/M") documentation process, providers document their medical decision-making and care during a patient encounter so that billing department coders can translate those services into the required CPT codes for billing purposes.[12]

31.    In addition to selecting the appropriate CPT codes, the coder must identify the appropriate provider who provided the services and submit that provider's National Provider Identifier ("NPI") and Provider Transaction Access Number ("PTAN") for billing.  The NPI identifies the individual healthcare provider that performed the services to be reimbursed.  The PTAN identifies the practice group or company for whom the provider works.

32.    CMS reimburses different types of healthcare providers at different rates.  For example, as discussed in detail below, CMS typically reimburses mid-levels at 85% of the full physician rate under federal statute and CMS regulations.  As such, any claim submitted to CMS must include the appropriate provider's NPI to avoid improper billing, as the NPI triggers the billing rate for any particular E/M service.  Once the coder has assigned the appropriate CPT codes and NPI for a particular patient encounter, the claim is submitted to a fiscal intermediary called a Medicare Administrative Contractor ("MAC") based on geographical location.  The MAC then processes the claims it receives and reimburses the provider according to Medicare's fee schedule.  MACs are typically private insurance companies that have been contracted by the federal government to process medical claims, and are responsible for the majority of enforcement efforts when it comes to Medicare claims.  For its part, CMS "manually reviews

---

[11] Providers may use either the 1995 or the 1997 Guidelines, but not a combination of the two.
[12] *See* CMS, EVALUATION AND MANAGEMENT SERVICES GUIDE: at 3-5 (November 2014), https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/eval_mgmt_serv_guide-ICN006764.pdf.

just three million of the estimated 1.2 billion claims it receives each year"—or 0.25% of all claims submitted.[13]  Thus, over 99% of submitted claims are never actually review by CMS.

### *The Medicaid Program and State Administration*

33.     The Medicaid Program ("Medicaid") is a Health Insurance Program administered by the Government of the United States and state agencies that is funded by state and federal taxpayer revenue.   The United States Health and Human Services Department oversees the administration of the program.  Medicaid was designed to assist participating states in providing medical services, durable medical equipment, and prescription drugs to financially-needy individuals that qualify for Medicaid.

34.     While the federal government sets basic guidelines and pays between 50% and 80% of the cost of Medicaid (depending on the state's per capita income), each state itself administers the program, decides provider qualifications, and reimburses providers for their services.

35.     Under Title XIX of the Social Security Act, each state must establish an agency to administer its Medicaid program according to federal guidelines.   The following table provides the Plaintiff States' Medicaid administrative agency and designated program name.

| State | Department | Medicaid Program Name |
|---|---|---|
| Florida | Agency for Health Care Administration | Florida Medicaid |
| Georgia | Department of Community Health | Georgia Medicaid |
| Indiana | Office of Medicaid Policy and Planning | Indiana Health Coverage Programs |
| Iowa | Department of Human Services—Iowa Medicaid Enterprise | Iowa Medicaid |
| Tennessee | Division of Health Care Finance and Administration | TennCare |

---

[13] Reed Abelson & Eric Lichtblau, *Pervasive Medicare Fraud Proves Hard to Stop*, N.Y. TIMES, Aug. 15, 2014, http://www.nytimes.com/2014/08/16/business/uncovering-health-care-fraud-proves-elusive.html.

| Texas | Health and Human Services Commission | Texas Medicaid |
|-------|--------------------------------------|----------------|

## V.    FACTUAL ALLEGATIONS

**A.    BACKGROUND**

36.    Apollo is among the nation's most profitable physician practice management companies ("PPMs"), which provide management and human-resources services to hospitals and, in particular, to emergency departments.  Apollo bases its business model not on quality of care but on reducing emergency department costs and increasing their revenues.  Apollo's revenue-based business model is built on three primary goals: (1) treat and bill more patients by increasing "patient throughput and allowing for volume growth"[14]; (2) implement standard coding and billing procedures to capture as much revenue as possible from CMS and private payers; and (3) align physicians' incentives with hospitals' incentives by compensating physicians based on the number of "patients they treat and the procedures they perform."[15]

37.    First, an integral part of Apollo's business model is moving patients through the emergency department as quickly as possible  *i.e.*, increasing "throughput."  To accomplish this, Apollo uses a floor-management model that often physically segregates physicians and mid-levels in different areas of the emergency department.  These floor-management models enable Apollo to increase revenue by: (1) increasing the volume of patients treated; and (2) using lower cost staffing, such as PAs and NPs, to treat more patients instead of expensive physicians.

38.    Second, Apollo's business model relies on the implementation of national, standardized billing and coding practices aimed at capturing as much revenue as possible from third-party payers like CMS.  Apollo touts its in-house billing company, which has the ability to

---

[14] http://apollomd.com/home/multispecialty-solutions/emergency-medicine/ (last visited Dec. 10, 2016).
[15] *Id.*

"utilize electronic records to maximize control and efficiency in the billing process, and continually leverage our size and legal expertise to successfully negotiate with managed care providers in order to maximize reimbursement."[16]  Coding is the process by which a patient's medical chart is translated into billable services that are then submitted to CMS (or private insurers) for reimbursement.  Apollo's standardized coding techniques are aimed at milking every last cent out of each medical chart.

39.     Finally, Apollo seeks to increase revenue by aligning physicians' incentives with hospitals' incentives.  Apollo does this by compensating physicians based on the number of "patients they treat and the procedures they perform."[17]  Apollo employs its emergency department physicians, like Dr. Sonyika, as independent contractors and compensates these physicians based upon a fixed-rate fee schedule agreed to by contract.  Apollo also pays its physicians a kickback for services provided by mid-levels even when there is no physician involvement, compensating physicians for each mid-level chart they sign.  Thus, physicians are financially incentivized to bring in as much revenue as possible—by treating patients and signing mid-level charts, which in turn increases Apollo's revenues.

**B.     APOLLO'S FRAUDULENT SCHEME**

40.     Relator has witnessed first hand the unlawful practices that Apollo utilizes to fraudulently increase billing to and reimbursement from CMS.  Through his personal knowledge, experience, and investigation, Relator has uncovered the unlawful scheme that Defendants systematically and purposefully use to submit false claims to CMS (the "Scheme").  Under the Scheme, Apollo overbills for services provided by mid-levels (*i.e.*, PAs and NPs) by fraudulently submitting claims for reimbursement for those services under a physician's NPI to be paid at the

---

[16] *Id.*

[17] *Id.*

higher physician rate. That is, although Apollo submits claims to CMS for reimbursement for mid-level services, it falsely indicates that a physician, rather than a mid-level, performed the services. Apollo does this because CMS reimburses for physician services at a higher rate than mid-levels services.

41.     Typically, services provided by mid-levels are reimbursed at 85% of the physician billing rate for E/M services.[18] *See* 42 U.S.C. § 1395l(a)(1)(O). To determine the allowable rate for a service provided by a mid-level, Medicare will select the proper amount based on the physician fee schedule and discount that amount by 15% to reach the appropriate 85% mid-level billing rate. The Plaintiff States have enacted similar reimbursement protocols for their Medicaid programs. When a mid-level performs services alone, without physician involvement, the proper procedure is to submit a claim for those services under the mid-level's name and NPI so the claim will be paid at the appropriate mid-level rate.

42.     In the vast majority of circumstances, mid-levels and physicians in Apollo's emergency departments treat patients separately. Under Apollo's business model—which is focused on maximizing efficiency and profits—physicians and mid-levels rarely, if ever, work alongside each other to perform true shared visits. Mid-levels treat lower acuity patients, and physicians treat higher acuity patients. Accordingly, the vast majority of claims submitted by Apollo for services provided by its emergency department mid-levels should be submitted under the mid-levels' NPIs. However, that it not what Apollo does.

---

[18] The Medicare statute specifically states, "with respect to services described in 1861(s)(2)(K) [42 USCS § 1395x(s)(2)(K)] (relating to services furnished by physician assistants, nurse practitioners, or clinic nurse specialists), the amounts paid shall be equal to 80 percent of (i) the lesser of the actual charge or 85 percent of the fee schedule amount provided under section 1848 [42 USCS § 1395w-4], or (ii) in the case of services as an assistant at surgery, the lesser of the actual charge or 85 percent of the amount that would otherwise be recognized if performed by a physician who is serving as an assistant at surgery[.]" 42 U.S.C. § 1395l(a)(1)(O).

43.     Despite the fact that mid-levels perform the vast majority of their services alone, Apollo uniformly submits claims for services provided *solely* by mid-levels under physician NPIs. Indeed, there can be no dispute regarding Apollo's uniform billing practice, as Apollo's Chief Operations Officer and Chief Quality Officer admitted this in an internal email sent on December 2, 2016, to all emergency physicians working for Apollo. *See* Exhibit 1 attached hereto. The email explains how Apollo internally measures certain data for CMS's physician quality reporting system ("PQRS"). In the email, the Apollo executive refer to mid-levels as APCs — or advance practice clinicians. The email clearly states that Apollo bills for *all mid-level (or APC) charts under the physician's NPI*:

Q: Do the PQRS measures include those patients that are APC charts that I sign, or are they my charts alone?
A: The charts are a combination of both "physician only" charts and "physician/APC charts". As the charts are billed under the physician NPI number, both will count equally for adjustments by CMS. For this reason, all charts attributed to the physician are included.

Q: Do the CT Reports include those patients that are APC charts that I sign, or are they my charts alone?
A: Same answer. The CT utilization data is a combination of both "physician only" charts and "physician/APC charts". As the charts are billed under the physician NPI number, we are accountable for the physician as well as the APC charts. As APCs tend to see less acute patients, this can actually make our CT utilization rate less. And as above, we are ultimately responsible for APC patients and the quality of the care they deliver to our patients.

*Id.*

44.     To avoid any confusion about the meaning of this email, Relator emailed Apollo's Chief Operating Officer, Amy Katnik, and asked, "What does APC stand for?" *See* Exhibit 2 attached hereto. Ms. Katnik responded that "APC" means "Advanced Clinician or midlevel." *Id.* Accordingly, Apollo's executives have confirmed Apollo's uniform billing practice for services provided by mid-levels is to bill for those services "under the physician NPI number." Exhibit 1.

45.     As noted above, the NPI that is used triggers the reimbursement rate CMS will apply. Thus, when Apollo uses a physician NPI to request reimbursement for mid-level services

(as it admits it does), CMS applies 100% of the physician rate to the request and, therefore, reimburses Apollo for the services of a mid-level as if a physician had performed them.

46.     To attempt to cover up this fraud, Apollo manipulates patient medical charts to falsely reflect what is called a "shared visit." A shared visit occurs when a mid-level performs services alongside and in conjunction with a supervising physician who provides a substantive portion of the face-to-face visit with the patient. When a true shared visit occurs, CMS reimburses for the mid-level services at the same rate as the physician's services, as if the mid-level were an extension of the physician. In the emergency department context, a shared visit is the *only* circumstance under which mid-level services may be reimbursed at the full physician rate.

47.     Apollo wholly ignores these regulations by requiring physicians to add a signature and "attestation" to *all* mid-level charts, though actual physician involvement is exceedingly rare. Coding and billing specialists working for Apollo then reduce the falsified medical charts to CPT codes and select the *physician's* NPI for billing purposes, despite the fact that the physician performed no services at all. *See* Exhibit 1. The coding is then submitted to CMS for reimbursement at the full physician rate, such that the mid-level's services are reimbursed under the physician's NPI. *See id.* Thus, Apollo systematically submits false claims to CMS. Below is a step-by-step explanation of how Apollo carries out the Scheme and cover-up.

48.     The Scheme starts with the floor-management models Apollo employs to increase "throughput."[19] Again, in most Apollo facilities, physicians and mid-levels work in different "zones" of the emergency department. Patients are assigned to either a physician or a mid-level depending on the severity of the patient's condition or injury. Dividing the emergency

---

[19] *See* http://apollomd.com/home/multispecialty-solutions/emergency-medicine/ (last visited Dec. 10, 2016).

department floor plan in this way all but eliminates direct interaction between physicians and mid-levels. This is intentional; the system prevents overlap and maximizes the number of patients each individual healthcare provider treats. However, the system also complicates communication between emergency department personnel and thereby facilitates Apollo's Scheme.

49.     Those patients that are assigned to mid-levels typically receive care from the mid-level alone without any physician involvement whatsoever. Under Apollo's floor-management models, it is extremely rare that mid-levels and physicians ever see the same patient or even discuss a patient's diagnosis or treatment plan.

50.     During or immediately following treatment, the mid-level will create and complete an EMR (electronic medical chart) for the patient, documenting all of the elements of treatment, which will be used for coding and billing later. These elements include a detailed or comprehensive medical history, physical examination, identification of medicines administered, tests ordered, images ordered, and a description of the medical decision making required.

51.     After the patient visit is over and the mid-level completes the EMR, Apollo *should* code and submit the claim to CMS for the mid-level's services *under the mid-level's NPI* so that CMS will appropriately reimburse Apollo at the 85% rate for mid-level's services. But, that is not what Apollo does. Instead, after completing the EMR, Apollo requires mid-levels to assign and send each of the charts to a physician for signature, regardless of whether the physician supervised the mid-level and actually saw the patient. Apollo even instructs mid-levels to assign their charts to physicians at random and to alternate which physician they assign their chart to so that payment for the mid-level services is equally distributed to the physicians. *See* Exhibit 3 attached hereto ("Midlevels: Please remember to reliably alternate back and forth

for the doc to whom you assign pts. It affects their paycheck."). The result is that *every single mid-level chart is assigned to a physician for signature* so that ApolloMD can, improperly, bill CMS for mid-level services at the full physician rate.

52.     Once an EMR has been completed and assigned to a physician by a mid-level, Apollo requires physicians to add a signature and "attestation" to each EMR. Physicians have no option to disagree with the care or documentation provided by the mid-level. Nonetheless, every emergency physician is *required* to sign and approve *every* mid-level chart sent to him or her at the end of each shift. A typically "attestation" will say something like, "I have consulted with Physician Assistant Smith and concur with the treatment she provided."

53.     Apollo hounds mid-levels to assign every chart to a physician and harasses physicians to countersign and attest to any outstanding mid-level charts. Apollo employs individuals at most, if not all, of its facilities whose primary role is to obtain physician signatures and attestations one every mid-level chart. Apollo also ensures employee compliance with these requirements by admonishing its healthcare providers that physician countersignatures are required for the mid-level services to be billed, even though there is no such CMS requirement. Worse still, Apollo ensures that its providers comply with Apollo's charting requirements by threatening that failure to do so will affect both individual paychecks (for those who do have outstanding charts) and the entire department's timely pay.

54.     Apollo has employed this company-wide scheme despite *knowing* that the Scheme violates CMS requirements and results in the submission of false claims for overpayment to CMS. Apollo sent documents prepared by its "coding partners" to Apollo employees as early as May 2011 explaining that submitting mid-level charts for reimbursement at the full physician rate was prohibited by CMS absent an actual face-to-face patient encounter

by the physician.  *See* Exhibit 4 attached hereto.  These documents establish that Apollo is fully aware of the facts that: (i) "A medical record should clearly identify the provider of the services rendered for it to be reimbursable"; and (ii) a mid-level "visit must be billed out under the name and number of the NPP [non-physician provider, or mid-level] and be reimbursed at 85% of the physician fee schedule."  *Id.*

55.     Despite its knowledge of CMS regulations, Apollo has implemented a detailed Scheme that wholly ignores and contradicts the CMS requirements.  Accordingly, it is apparent that Apollo has willfully designed and perpetrated the Scheme with full knowledge of the Scheme's unlawfulness.  Thus, each fraudulent claim for mid-level services Apollo has submitted to CMS has been submitted with the requisite mental state under the FCA.  *See* 31 U.S.C. § 3729.

56.     Apollo also submits these false claims to CMS and state payers with knowledge of the falsity of the underlying EMRs (*i.e.*, knowledge that a shared visit did not truly occur despite the physician attestations and signatures on the EMRs) and the falsity of the resulting claims for reimbursement at the full physician rate for services *never* provided by a physician.  At the very least, Apollo submits such claims with reckless disregard for the truth or falsity of the information upon which the claims are made.

57.     Apollo systematically perpetrates the Scheme nationwide.  Relator observed the exact same policies regarding mid-level charting and physician countersignatures at the two Apollo emergency departments where he has worked for the past six years.  Additionally, the uniformity of Apollo's information systems, procedures, policies, training, and communications confirms that the Scheme is not an isolated occurrence, but is embedded in Apollo's business model.  Again, the email wherein Apollo's executives essentially admit to the Scheme was sent

to *all Apollo physicians* and *came from executives at the corporate headquarters in Atlanta.* *See* Exhibits 1 & 2. And, Relators own payment history, discussed *infra*, also proves the systemic nature of the Scheme, as it establishes that Apollo pays Relator a kickback for every mid-level chart he signs, even when he never treated the mid-level's patient. The kickback money is derived from the ill-gotten proceeds Apollo obtained from billing CMS for the mid-level's services under Relator's NPI. *See* Exhibit 5 attached hereto.

58.     Apollo's Scheme violates CMS regulations governing reimbursement for E/M services performed by mid-levels and thus the FCA.

**C.     PAYMENT OF KICKBACKS TO FURTHER THE SCHEME**

59.     Apollo perpetrates its Scheme in part by offering and paying its physicians a kickback to falsify patient charts so that Apollo can overbill Medicare for services at the physician rate. Indeed, Apollo clearly states that each physician's pay is directly tied to the number of mid-level charts signed and attested to by each physician.

60.     The internal employee payment portal at ApolloMD.net demonstrates that physicians are paid a kickback for the mid-level charts they sign. Relator's own payment history directly reflects payments for mid-level encounters that he had no involvement in. *See* Exhibit 5. Though Apollo labels these payments as being for patient visits involving both the physician and a mid-level (MLP or PA), in reality, the physician had no involvement in the encounter at all. In fact, Relator estimates that 99% of the time, Apollo physicians sign mid-level charts at the end of their shifts, long after most of the patients have already been discharged. Thus, it would be impossible for the physician to have seen the patient with the mid-level provider. Yet, each month, Apollo physicians are paid for every mid-level chart they sign. That has been the case since Relator started working for Apollo in 2010. Indeed, Relator has been compensated for

more than 400 mid-level encounters in a single month—all for simply signing the mid-level charts assigned to him. In the chart below, this is shown in the column labeled "Pts w/ MLP," which means "Patients with Mid-Level Provider" (though Relator did not actually see any of the patients with a mid-level):

| Facility | Payroll Period | Pts Dr Only | Pts w/ MLP | Pts Total | % Current MOS Pts | Current MOS Pts/Hour | Dr Hours Worked | Pts/Dr Hour, Dr Only | Pts/Dr Hour, Total (Incl MLP) | $ Generated Dr Only Pts | $ Generated MLP Patients | $ Generated Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Spalding Regional Medical Center | 7/1/16 | 321 | 274 | 595 | 97.8% | 4.23 | 137.50 | 2.33 | 4.33 | $22,158 | $12,632 | $34,790 |
| **Spalding Regional Medical Center** | **6/1/16** | **286** | **244** | **530** | **99.8%** | **4.11** | **128.50** | **2.23** | **4.12** | **$18,778** | **$10,603** | **$29,381** |
| Spalding Regional Medical Center | 5/1/16 | 305 | 237 | 542 | 96.5% | 4.32 | 121.00 | 2.52 | 4.48 | $20,330 | $10,052 | $30,381 |
| **Spalding Regional Medical Center** | **4/1/16** | **372** | **314** | **686** | **99.0%** | **4.28** | **158.50** | **2.35** | **4.33** | **$25,673** | **$13,926** | **$39,599** |
| Spalding Regional Medical Center | 3/1/16 | 381 | 351 | 732 | 99.9% | 4.40 | 166.00 | 2.30 | 4.41 | $26,141 | $15,979 | $42,120 |
| **Spalding Regional Medical Center** | **2/1/16** | **392** | **357** | **749** | **99.3%** | **4.65** | **160.00** | **2.45** | **4.68** | **$26,230** | **$15,723** | **$41,953** |
| Spalding Regional Medical Center | 1/1/16 | 382 | 429 | 811 | 97.2% | 4.92 | 160.00 | 2.39 | 5.07 | $26,288 | $18,463 | $44,752 |

*See* Exhibit 5. Each month, Relator is credited with treating patients that were actually seen by a mid-level. Relator did not see, nor simultaneously consult with the mid-levels regarding, any of these patients.

61.     The same is true for the graphical depiction below, which falsely shows that Relator treated "Patients with PA":

24

All        Sonyika, Chionesu        All

Generated on    8/19/2016 11:10 AM

| Hospital | Month | Year | Patients Dr. Only | Patients w/Mid-Level | Patients Total |
|----------|-------|------|-------------------|----------------------|----------------|
| AMC South | Sep | 2010 | 1 | 0 | 1 |
| AMC South | Oct | 2010 | 161 | 17 | 178 |
| AMC South | Nov | 2010 | 92 | 32 | 124 |
| AMC South | Dec | 2010 | 50 | 24 | 74 |
| AMC South | Jan | 2011 | 73 | 16 | 89 |
| AMC South | Feb | 2011 | 50 | 34 | 84 |
| AMC South | May | 2011 | 90 | 54 | 144 |
| AMC South | Jun | 2011 | 35 | 28 | 63 |
| AMC South | Jul | 2011 | 35 | 21 | 56 |
| AMC South | Sep | 2011 | 18 | 9 | 27 |
| AMC South | Oct | 2011 | 68 | 35 | 103 |
| AMC South | Nov | 2011 | 58 | 23 | 81 |
| AMC South | Dec | 2011 | 74 | 38 | 112 |
| AMC South | Jan | 2012 | 123 | 80 | 203 |
| AMC South | Feb | 2012 | 95 | 62 | 157 |
| AMC South | Mar | 2012 | 173 | 117 | 290 |
| AMC South | Apr | 2012 | 169 | 68 | 237 |
| AMC South | May | 2012 | 197 | 117 | 314 |
| AMC South | Jun | 2012 | 219 | 97 | 316 |
| AMC South | Jul | 2012 | 145 | 87 | 232 |



PA Participation (Patient Count Includes Providers PA and MD)

*See* Exhibit 6 attached hereto.  In reality, Relator did not treat or see these patients with a mid-level; instead, Apollo simply required Relator to sign and attest to the charts prepared by mid-levels.

62.      As Relator's payment history demonstrates, Relator was paid a portion of the revenue Apollo fraudulently received from CMS, and Apollo directly ties its independent contractor physicians' compensation to the volume of mid-level charts the physicians sign.  This *quid pro quo* is a textbook kickback, which the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), prohibits.

63.      Apollo is inducing physicians to order services reimbursed by Medicare—namely physician E/M services—that are not actually occurring in the vast majority of cases.  Accordingly, in addition to flouting the FCA, Apollo's Scheme violates the AKS.

## VI.    CAUSES OF ACTION

### Count One:  Violations of the Federal False Claims Act,
### 31 U.S.C. § 3729(a)(1)(A)

64.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

65.    The FCA, 31 U.S.C. § 3729(a)(1)(A) imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval to the United States government.

66.    When the submission of such false claims is discovered by a private citizen, the FCA allows the citizen to bring an action on behalf of the United States against the perpetrators. 31 U.S.C. § 3730(b)(1).

67.    Through their conduct, Defendants have knowingly presented, or caused to be presented, false claims for payment, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(A). Specifically, Defendants have submitted false claims for reimbursement for evaluation and management services performed solely by mid-level practitioners in Apollo emergency departments as if they were performed by or in conjunction with a physician.

68.    Relator has brought this action pursuant to 31 U.S.C. § 3730(b)(1) and provided a Disclosure Statement to the United States in compliance with § 3730(b)(2).

69.    By reason of Defendants' actions, the United States has incurred and continues to incur damages.

### Count Two:  Violations of the Federal False Claims Act,
### 31 U.S.C. § 3729(a)(1)(B)

70.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

71.     Section 3729(a)(1)(B) of the FCA imposes liability upon those who make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim to the United States government. *See* 31 U.S.C. § 3729(a)(1)(B).

72.     Defendants have made, used, or caused to be made or used, false records or statements on medical charts and records regarding the provider of medical services by requiring physicians to sign and attest to mid-level charts for which physicians provided no face-to-face medical treatment and using the falsified charts and records to support claims to CMS for reimbursement at the full physician rate, as if a physician— rather than a mid-level— provided the services.  As such, through their conduct, Defendants have made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of 31 U.S.C. § 3729(a)(1)(B).

73.     By reason of Defendants' actions, the United States has incurred and continues to incur damages.

### Count Three:  Violations of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b

74.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

75.     Section 1320a-7b(b) of the Social Security Act makes it illegal to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal

health care program.  Violation of the AKS is a felony punishable by fines and imprisonment, and can also result in exclusion from participation in federal health care programs.  42 U.S.C. §§ 1320a-7(b)(2), 1320a-7(b)(7).

76.     In addition, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for the purposes" of the FCA."  42 U.S.C. § 1320a-7b(g).

77.     Through their conduct, Defendants have knowingly and willfully offered and paid kickbacks to contracted physicians and mid-level providers to induce their ordering of non-existent and/or medically unnecessary emergency department services and procedures by directly tying physicians' compensation to the volume of mid-level charts physicians sign each month.

78.     As set forth above, Defendants offer and pay these kickbacks in exchange for physician signatures and attestations on mid-level charts in violation of the AKS. Defendants submit such false charts to CMS for reimbursement under the physician's   rather than the mid-level's—NPI so that Defendants may fraudulently obtain reimbursement for the mid-level services provided at the full physician reimbursement rate.

79.     None of the statutory or regulatory safe harbors apply to Defendants' conduct.

80.     Because this violation of the Anti-Kickback Statute involves a claim for reimbursement to a federal health care program, and that violation is material to the government's reimbursement decision, Defendants' have submitted false claims for reimbursement that include items or services resulting from a violation of the AKS, which constitute false claims under the FCA. *See* 42 U.S.C. § 1320a-7b(g).

81.     By reason of Defendants' actions, the United States has incurred and continues to incur damages.

## Count Four:  Florida False Claims Act,
### FL. STAT. § 68.081 *et seq.*

82.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

83.     Florida statutes enable the Agency for Health Care Administration to establish the maximum allowable fee for providers through Medicaid rules, policy manuals and handbooks. Fl. Stat. §§ 409.901(2), 409.908.  Similar to Medicare, the Florida Agency rules allow for reimbursement for PA services and NP services at a rate below the physician rate, specifically at eighty percent (80%) of the physician rate.  Florida Medicaid Practitioner Services Coverage and Limitations Handbook (April 2014), Ch. 3, § 3-6.

84.     The Florida False Claims Act imposes liability upon those who knowingly present or cause to be presented a false or fraudulent claim for payment or approval and those who knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim.  Fl. Stat. § 68.082(2).

85.     Through their conduct, Defendants have knowingly presented or caused to be presented false or fraudulent claims for approval, as set forth above, to the Florida Medicaid system in violation of Florida Statute § 68.082(2).

86.     Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, as set forth above, in violation of Florida Statute § 68.082(2).

87.     Relator brings this action in accordance with the civil action provision in Florida Statute § 68.083(2) and has complied with all requirements therein.

88.     By reason of Defendants' actions, the State of Florida has incurred and continues to incur damages.

**Count Five:  Georgia State False Medicaid Claims Act,**
**GA. CODE § 49-4-168**

89.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

90.     Similar to Medicare, Georgia Medicaid rules limit reimbursement for services provided by a PA to no more than 90% of the maximum allowable amount paid to a physician. *See* Georgia Department of Community Health, Division of Medicaid, Policies and Procedures for Physician Services Handbook Ch. 1001.

91.     The Georgia State False Medicaid Claims Act imposes liability upon those who knowingly present or cause to be presented to the Georgia Medicaid program a false or fraudulent claim for payment or approval and those who knowingly make, use, or cause to be made or used a false record or statement material to a false or fraudulent claim to the Georgia Medicaid program.  Ga. Code § 49-4-168.

92.     Through their conduct, Defendants have knowingly presented or caused to be presented to the Georgia Medicaid program false or fraudulent claims for payment or approval, as set forth above, in violation of Georgia Code § 49-4-168.

93.     Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted to the Georgia Medicaid program, as set forth above, in violation of Georgia Code § 49-4-168.

94.     Relator asserts this claim in accordance with the civil action provision in Georgia Code § 49-4-168.2 and has complied with all requirements therein.

95.     By reason of the Defendants' actions, the State of Georgia has incurred and continues to incur damages.

**Count Six:  Indiana Medicaid False Claims and Whistleblower Protection Act,
IND. CODE § 5-11-5.7-1 *et seq.***

96.     The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

97.     Similar to Medicare, the Indiana Medicaid rules allow for reimbursement of services provided by NPs at a rate below the physician's rate, specifically at seventy-five percent (75%) of the physician rate on file.   Indiana Health Coverage Programs BR 200422 (June 1, 2004).

98.     The Indiana Medicaid False Claims and Whistleblower Protection Act imposes liability upon those who knowingly present, or cause to be presented, a false claim to the State of Indiana for payment or approval and those who make, use, or cause to be made or used, a false record or statement that is material to a false or fraudulent claim.  Ind. Code § 5-11-5.7-2.

99.     Through their conduct, Defendants have knowingly presented, or caused to be presented, false claims to the State of Indiana for payment or approval, as set forth above, in violation of Indiana Code § 5-11-5.7-2.

100.     Through their conduct, Defendants have also made, used, or caused to be made or used, false records or statements that are material to false or fraudulent claims submitted to the State of Indiana for payment or approval, as set forth above, in violation of Indiana Code § 5-11-5.7-2.

101.     Relator asserts this claim in accordance with the civil action provision in Indiana Code § 5-11-5.7-4 and has complied with all requirements therein.

102.     By reason of Defendants' actions, the State of Indiana has incurred and continues to incur damages.

### Count Seven:  Iowa False Claims Act
### IOWA CODE §§ 685.1 *et seq.*

103.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

104.    Similar to Medicare, Iowa Medicaid rules allow for reimbursement for services performed by mid-levels at a rate below the physician rate, specifically at no more than 85% of the physician fee schedule.[20]

105.    The Iowa False Claims Act imposes liability upon those who knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval and those who knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim.  Iowa Code § 685.2(1).

106.    Through their conduct, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval from the Iowa Medicaid program, as set forth above, in violation of Iowa Code § 685.2(1)(a).

107.    Through their conduct, Defendants have knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims for payment or approval under the Iowa Medicaid program, as set forth above, in violation of Iowa Code § 685.2(1)(b).

108.    Relator brings this action in accordance with the civil action *qui tam* provision in Iowa Code § 685.3 and has complied with all requirements therein.

109.    By reason of Defendants' actions, the State of Iowa has incurred and continues to incur damages.

---

[20] *See* Iowa Dep't of Human Services, Iowa Medicaid Fee Schedule Factor Code Explanation, http://dhs.iowa.gov/sites/default/files/FactorCodeExplanation.pdf.

**Count Eight:  Tennessee Medicaid False Claims Act,
TENN. CODE ANN. § 71-5-181 *et seq.***

110.    The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

111.    Similar to Medicare, Tennessee Medicaid rules allow for reimbursement for services performed by a PA at a rate below the physician rate, specifically at no more than sixty percent (60%) of the charges provided for licensed physicians.  Tenn. Code Ann. § 71-5-129.

112.    The Tennessee Medicaid False Claims Act imposes liability upon those who knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval under the Medicaid program and those who knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim under the Medicaid program. Tenn. Code Ann. § 71-5-182.

113.    Through their conduct, Defendants have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval under the Tennessee Medicaid program, as set forth above, in violation of Tennessee Code § 71-5-182.

114.    Through their conduct, Defendants have also knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims submitted under the Tennessee Medicaid program, as set forth above, in violation of Tennessee Code § 71-5-182.

115.    Relator brings this action in accordance with the civil action *qui tam* provision in Tennessee Code § 71-5-183 and has complied with all requirements therein.

116.    By reason of Defendants' actions, the State of Tennessee has incurred and continues to incur damages.

### Count Nine:  Texas Medicaid Fraud Prevention Act,
### TEX. HUM. RES. CODE § 36.002 *et seq.*

117.   The preceding factual statements and allegations are incorporated herein by reference as if fully set forth herein.

118.   Similar to Medicare, Texas Medicaid rules allow for reimbursement for services provided by a mid-levels at a rate below the physician rate, specifically at ninety-two percent (92%) of the reimbursement for the same professional service paid to a physician   Tex. Admin. Code tit. 1, §§ 355.8093, 355.8281.

119.   The Texas Medicaid Fraud Prevention Act imposes liability upon those who: (1) knowingly make or cause to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, and (2) knowingly conceal or fail to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized.  Tex. Hum. Res. Code § 36.002.

120.   Through their conduct, Defendants have (1) knowingly made or caused to be made false statements or misrepresentation of material fact in order to receive payment under the Texas Medicaid program that is not authorized, and/or (2) knowingly concealed or failed to disclose information to receive payment under the Texas Medicaid program that is not authorized, as set forth above, in violation of Texas Human Resources Code § 36.002.

121.   Relator brings this action in accordance with the civil action *qui tam* provision in Texas Human Resources Code § 36.101 and has complied with all requirements therein.

122.   By reason of Defendants' actions, the State of Texas has incurred and continues to incur damages.

34

## VII.   **DEMAND FOR JURY TRIAL**

123.   Relator expressly demands a trial by jury.

## VIII.   **PRAYER FOR RELIEF**

WHEREFORE, Relator, on behalf of himself, the United States and the Plaintiff States, request that this Court:

(a)   Enter judgment that Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims or otherwise violating 31 U.S.C. §§ 3729-3733;

(b)   Enter judgment against each Defendant in an amount equal to three times the damages the United States has sustained as a result of each and all of Defendants' actions, as well as a civil penalty against each Defendant of $11,000 for each violation of 31 U.S.C. § 3729;

(c)   Find joint and several liability against Defendants pursuant to 31 U.S.C. § 3729;

(d)   Enter judgment that Defendants be ordered to cease and desist from submitting and/or causing the submission of additional false claims violating the statutes of the respective Plaintiff States as pled herein;

(e)   Enter judgment against each Defendant in an amount equal to three times the damages the respective Plaintiff States have sustained as a result of each and all Defendants' actions, as well as a civil penalty against each Defendant in the maximum amount allowable under the statutes of each respective Plaintiff State for each and every false record, statement, certification and claim submitted to the respective Plaintiff States;

(f)   Award Relator the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and the relevant provisions of the statutes of each of the Plaintiff States;

(g)    Award Relator all costs and expenses of this action, including court costs, expert fees, and all attorneys' fees incurred by Relator in prosecution of this action; and

(h)  Grant the United States, the Plaintiff States and Relator each any further relief as the Court deems just and proper.

Respectfully submitted,

s/Seth Miles
Seth Miles
(Florida Bar Number: 385530)
E-mail address: seth@bucknermiles.com
David M. Buckner
(Florida Bar Number: 060550)
E-mail address: david@bucknermiles.com
Buckner + Miles
3350 Mary Street
Miami, Florida 33133
Telephone: (305) 964-8003
Facsimile: (786) 523-0485

Michael Angelovich, TX Bar No. 785666
mangelovich@nixlaw.com
Trey Duck, TX Bar No. 24077234
tduck@nixlaw.com
Cody L. Hill, TX Bar No. 24095836
codyhill@nixlaw.com
Nix, Patterson & Roach, LLP
3600 N. Capital of Texas Hwy.
Building B, Suite 350
Austin, TX 78746
Telephone: 512.328.5333
Facsimile: 512.328.5335

Ed Dougherty, MO#26862
edougherty@dh-law.com
DOUGHERTY & HOLLOWAY, LLC
7200 NW 86th St., Suite D
Kansas City, MO 64153
Telephone: 816.891.9990
Facsimile: 816.891.9905